**Peter Kole MURRAY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 83–62.

Supreme Court of Wyoming.

Nov. 2, 1983.

Leonard D. Munker, State Public Defender and Sylvia Lee Hackl, Appellate Counsel, Public Defender Program, Cheyenne, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Senior Asst. Atty. Gen., and Dennis C. Cook, Asst. Atty. Gen., for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

CARDINE, Justice.

Appellant was charged with attempted sexual assault felony murder under §§ 6-4-101 and 6-4-314, W.S.1977.[1] After having been found guilty of that charge by a jury on January 18, 1983, he was, by judgment and sentence of the court, sentenced to life imprisonment. He appeals from the judgment and sentence.

We will affirm.

The issues raised on this appeal are, as stated by appellant:

1. "The trial court erred in denying appellant's motion for change of venue, which motion alleged that extensive pretrial publicity made it impossible to select a fair and impartial jury."

2. "The trial court erred in denying appellant's motion for judgment of acquittal since there was insufficient evidence upon which the jury could base a verdict of guilty beyond a reasonable doubt."

## FACTS

On July 18, 1982, during the late evening hours, Cleo Fuller was the victim of a sexual assault and beating that twelve days later resulted in her death. At the time, Mrs. Fuller was 82 years of age and lived alone in her home in Cokeville, a small community in western Wyoming. She had gone to bed and fallen asleep about 10:30

p.m. when she was awakened by a noise first at the front of her house and then at the back door. She opened the back door and a young, strong man grabbed her and dragged her through the kitchen to the living room where she was brutally beaten. She offered him money and her rings, but he said he was going to sexually assault and then kill her. It was dark, Mrs. Fuller was half asleep, in shock, did not have her glasses on, and could not identify her assailant. She scratched him hard on the back and then, at the first opportunity, kicked him hard in the groin. After being kicked, he gave up and left.

Mrs. Fuller struggled, crawled and dragged herself across the room to her telephone, and called a neighbor across the street. The neighbor received the call between 11:20 and 11:30 p.m. He dressed and came to her house. There were no lights. He went back across the street and roused another neighbor. The police were called, and the two neighbors then returned to Mrs. Fuller's house.

An ambulance arrived with three medical technicians. Gregg Goodman, an officer with the Cokeville Police Department arrived. They and the two neighbors were in the house when Mrs. Fuller described the assault and attempted rape and said the assailant "should have scratch marks on his back and * * * arms," because, "I dug him as hard as I could."

In a later tape-recorded interview before her death, she said she scratched her assailant with her right hand on his back, and then, after being asked how many times she had scratched her assailant, she stated as follows:

> "(b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law."

Section 6-4-314, W.S.1977, as it appeared at the time, provided:

> "Whoever perpetrates an assault or assault and battery upon anyone with intent to commit a sexual assault in the first or second degree, shall, upon conviction, be imprisoned in the penitentiary not less than one (1) year nor more than five (5) years."

---

1. Section 6-4-101, W.S.1977, as it appeared at the time of the commission of the offense, provided:

"(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, sexual assault, arson, robbery or burglary, or by administering poison or causing the same to be done, kills any human being, or whoever purposely and with premeditated malice kills any peace officer, corrections employee or fireman acting in the line of duty, is guilty of murder in the first degree.

"CLEO: Yes, I think so, two or three times

"GREGG: Two or three times

"CLEO: That's right, you see I, he was here, I reached around there and I scratched like that, just as hard as I could"

Cleo Fuller suffered broken teeth, bruises about her face and arms, fractures of 3, 4, 5 and 6 ribs on the left and 1, 2, 3, 4, 5 and 6 ribs on the right. She died twelve days later as a result of the beating.

Appellant, at the time of the assault, was twenty-four years of age and had resided in western Wyoming in the Bridger Valley area most of his life. He had worked in law enforcement in several western communities over a period of about four years. He was employed by the Cokeville Police Department approximately three months before this homicide.

Appellant had rented the house in which he was living in Cokeville from Cleo Fuller. He had done yard work and other small jobs for her. His house was approximately a block and a half from Cleo Fuller's house and about two blocks from the house of Gregg Goodman. A young man, Ted Lamb, was living with appellant at the time of this incident. He had come to Cokeville a short time before to be involved in an undercover narcotics investigation.

On the evening of July 18, 1982, appellant had been invited to dinner at the home of Gregg Goodman. Appellant arrived around 7:00 p.m., too late for dinner, and he, Goodman, his wife and another young lady, sat around drinking alcoholic beverages. Appellant drank about one-half of a fifth of whiskey. About 10:30 p.m., the young lady at Goodman's home decided to leave. Appellant followed her to her car, had a short discussion with her, propositioned her, was refused, and returned to the Goodman house. Appellant left the Goodman house between 10:45 and 11:00 p.m.

Between 11:20 and 11:30 p.m., appellant's roommate, Ted Lamb, and another young lady, returned to appellant's house. They found the front door broken open, entered the house and searched but could not find appellant. Bathwater had been drawn, was still in the tub, and there were indications that someone may have bathed. Lamb searched outside the house and still could not find appellant. On reentering the house, the young lady advised Lamb she had heard a noise in the woodbox. They opened the woodbox and found appellant lying on his back staring up, his eyes glassy, completely nude. He motioned them to close the lid on the woodbox, and they did so. A short time later they reopened the cover of the woodbox and appellant was still gazing straight ahead, apparently in some distress. He was helped out of the woodbox onto his bed. He was unsteady, his eyes were glassy, he was uncommunicative, and Lamb and the girl were concerned that he had overdosed on drugs. They, therefore, called for an ambulance to come to the house.

A highway patrolman heard the call for an ambulance for appellant and, at about the same time, 12:03 a.m., he had received a call advising him that Cleo Fuller had been assaulted in her home. The highway patrolman went first to appellant's home. Appellant ordered the patrolman and others out of his house. They left and the ambulance was dispatched to Cleo Fuller's home.

The two homes were not far apart in the small community of Cokeville. By this time there was a large number of persons involved who at one time or another were in both the Cleo Fuller home and appellant's home. There were two neighbors, three medical technicians, an officer from the Cokeville Police Department, appellant, his roommate, his girlfriend, her mother, and others. All of them were called as witnesses and testified at the trial. In essence, they testified that appellant had said he had been stuck with a needle at Goodman's home. He pointed to a place under his arm that was sore. He appeared to have overdosed on drugs. He appeared also to be intoxicated. Fresh blood and scratches were observed on his back, his left shoulder, his arm, and his lower back. These were photographed, and the photographs were received in evidence. When asked about

the scratches, he became very angry and had no explanation for how they had occurred. He could not account for his whereabouts from about 10:45 p.m. until approximately 11:30. At one point he told an officer who interviewed him that he "could have done it." During one conversation, one of the officers stated that Mrs. Fuller had offered her assailant money and appellant responded, "Yeah." At another point, the highway patrolman said that appellant had accused another person of raping the seventy-year-old woman (referring to the eighty-two-year-old Mrs. Fuller). This was disputed by other testimony. There was bathwater in the tub and indications that someone had bathed. A towel taken from appellant's residence contained a hair that matched Cleo Fuller's hair. The T-shirt appellant had worn the night of the assault was freshly laundered, but blood stains on the left shoulder were confirmed in a laboratory examination.

## DENIAL OF MOTION FOR CHANGE OF VENUE

The trial of this cause was held at the county seat of Lincoln County, Kemmerer, Wyoming, which is about forty miles south of Cokeville. The trial commenced on January 10, 1983, with jury selection. Appellant's counsel had moved for a change of venue because of extensive publicity given the case which appellant claimed would prevent the selection of an unbiased, fair, and impartial jury. The motion for change of venue was taken under advisement by the court and denied following completion of the selection of the jury. Appellant claims this was error.

Rule 21, W.R.Cr.P., provides that the prosecution of a crime shall be had in the county where the offense is committed.[2] Rule 23(a), W.R.Cr.P., provides that venue may be changed if there exists prejudice against the defendant so great that he cannot obtain a fair and impartial trial in the county where the offense occurred.[3]

■ The defendant (appellant in this case) carries the burden of proof and must demonstrate that there exists within the county prejudice so great that the defendant cannot obtain a fair and impartial trial in that county. *Collins v. State,* Wyo., 589 P.2d 1283 (1979). In determining whether such prejudice exists, consideration should be given, before jury selection, to:

a. The nature and extent of the publicity.

■ If the court finds from the motion, the materials and exhibits filed with it, and any testimony received before commencement of the trial, that the degree of prejudice necessary exists, then venue should be changed at that stage in the proceedings in accordance with the further provisions in Rule 23(b) and (c), W.R.Cr.P.[4] If not satisfied that there was a showing of prejudice so great as to preclude a fair trial, the court may deny the motion or take it under advisement (as was done in this case) and then, in addition, also consider,

2. Rule 21, W.R.Cr.P., provides:
   "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in the county in which the offense is alleged to have been committed."

3. Rule 23(a), W.R.Cr.P., provides:
   "(a) *For prejudice in the county.*—The court upon motion of the defendant made at least 15 days prior to the date set for trial, shall transfer the proceeding as to him to another county, whether or not such county is specified in the defendant's motion, if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

4. Rule 23(b) and (c), W.R.Cr.P., provides:

   "(b) *Proceedings on transfer.*—When a transfer is ordered the clerk shall transmit to the clerk of the court to which the proceeding is transferred all papers in the proceeding or duplicates thereof and any bail taken, and the prosecution shall continue in that county.

   "(c) *Only one change granted.*—Nothing in this rule shall authorize the granting of more than one (1) change of venue but both sides shall be heard to urge their objections to any county in the first instance, and change of venue shall be to the most convenient county to which the objections of the parties do not apply or are the least applicable."

b. The difficulty or ease in selecting a jury, and whether the prejudice claimed actually appears during jury selection. *State v. Greenawalt,* 128 Ariz. 388, 626 P.2d 118 (1981).

We consider first the nature and extent of publicity. In this case, there were several news articles that appeared in newspapers circulated in the Kemmerer area. The first mostly recited the charge contained in the indictment. Neither the prosecuting attorney nor law enforcement officials commented upon or discussed details of the indictment. The next article contained quotes from the affidavit of a deputy sheriff filed in support of the complaint and warrant issued out of justice court. The article was mostly factual, recited that appellant had lived two blocks from the Fuller house, and that he could not remember some of the details of that night. The third article was similar to prior articles in that it contained quotes from the affidavit filed in the court file and some comments from law enforcement personnel concerning their surprise at the indictment because appellant had performed well as an officer at Cokeville and had done "a bang-up job." There was a letter to the editor in one newspaper that was highly critical of the sheriff in the manner in which the investigation had been handled. The sheriff responded to that letter by simply stating he could not comment on the case while it was pending. The balance of releases concerned settings for trial or vacating and resetting the trial. The last news article was on September 23, 1982, and it simply recited the date set for trial. The trial was held approximately four months after the last news article.

In all, there were seven news articles. Three recited some factual information concerning the incident which appeared to have been taken from documents filed in the court file, a public record. The other four articles were very brief and concerned mostly trial settings, continuances and resetting the case for trial. There was no editorial comment nor opinions concerning the guilt or innocence of appellant.

*Collins v. State,* supra, is factually similar to the instant case. The incident resulting in criminal charges occurred at the Long Branch Bar at Reno Junction. Reno Junction is a small community south of Gillette, Wyoming. Gillette is the county seat and the place where the trial was held. A motion for change of venue was presented to the court and supported by a compilation of numerous news articles, and the testimony of a bank teller and the news director of the local radio station concerning widespread publicity. Their opinion was that appellant, in that case, could not obtain a fair and impartial trial. The news coverage and publicity in the Collins case was considerably greater, more extensive, and occurred over a longer period of time than in the instant case.

In *Collins,* after stating that the news articles were numerous and accumulated between the time of the crime and the motion for change of venue, we said

"* * * An examination indicates that they are objective, give a report of what occurred, narrate the progress of the proceedings from time to time, and are of a generally informative nature. There is no editorial reporting nor any editorials containing any sort of a conclusion that the defendant was guilty. * * *" 589 P.2d at 1287.

The initial motion for change of venue in that case was denied.

■ In this case, the motion for change of venue was supported by just seven news articles released over a period of approximately two months from the occurrence of this incident in July until September 23, 1982. There was not extensive publicity. The news articles contained materials almost entirely found in the court file of this case and the public records. The reports were factual. There were no editorials nor opinions in the articles concerning the guilt or innocence of appellant. There was no "carnival-like atmosphere" surrounding the proceedings as would deny appellant a fair trial under the Due Process Clause of the Fourteenth Amendment as in *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d

543, reh. denied 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965).

■ Appellant had the burden of showing prejudice so great or general as to preclude his receiving a fair and impartial trial; and the determination as to whether such prejudice exists is a matter addressed to the sound discretion of the trial court. *Chavez v. State,* Wyo., 604 P.2d 1341 (1979). The mere fact that potential jurors may have heard of the incident or read about it in news articles is not determinative of the issue. That is to be expected with a free press; and where the news articles are largely factual and not inflamatory (as in this case), they cannot be considered prejudicial. *Shaffer v. State,* Wyo., 640 P.2d 88 (1982).

■ Thus, at this stage of the proceeding, there was no abuse of discretion in finding that the degree of prejudice necessary had not been demonstrated. The court, therefore, properly deferred its ruling upon the motion for change of venue so that it could consider the second factor bearing upon the question of prejudice,

> b. The difficulty or ease in selecting a jury, and whether the prejudice claimed actually appears during jury selection. *State v. Greenawalt,* supra.

A panel of eighty-six jurors was called from which the jury in this case was selected. The trial court allowed the attorneys considerable latitude in conducting voir dire. They explored thoroughly jurors' exposure to publicity; any prior knowledge they might have concerning the death of Cleo Fuller, the crime charged and any opinions that they might have formed; their knowledge of the parties or the case and whether they believed the defendant guilty as he sat in the courtroom, or whether they would require him to put in any evidence in his defense. Fifteen jurors were excused for cause. Six of those excused had formed an opinion, prejudged the case, and could not be fair and impartial if

selected as jurors. One juror, recognizing she must be impartial, was unsure and the court excused her. She was from Cokeville. The other eight jurors were excused for cause for reasons unconnected with bias or prejudice toward the defendant. The reasons included a sick child, hardship in an occupation or business, prejudice against the use of intoxicating liquor, strong feelings against the police department for the handling of the case—reasons common in all jury trials.

■ Four jurors were excused peremptorily by appellant. Jury selection was completed in a little more than a day (voir dire concluded at 10:15 a.m. the second day of the trial) without difficulty. Most of the jurors had heard of the case. That is to be expected in a sparsely populated rural community. That they had heard of the case does not in itself establish that they are so knowledgeable or hold such strong opinions that they cannot be fair and impartial if selected as jurors.

■ At the conclusion of jury selection, appellant renewed his motion for a change of venue. A change of venue may be granted *"if the court is satisfied* there exists * * * so great a prejudice" that defendant cannot obtain a fair and impartial trial. Rule 23(a), W.R.Cr.P., supra. The determination of prejudice to the satisfaction of the court is primarily factual and will not be disturbed unless clearly erroneous. *Chavez v. State,* supra. Considering both the nature of the pretrial publicity and the ease of jury selection in this case, the court properly denied the motion for change of venue.

## DENIAL OF MOTION FOR JUDGMENT OF ACQUITTAL

The State of Wyoming rested its case at the conclusion of presentation of its evidence. Appellant then made a motion for judgment of acquittal in accordance with the provisions of Rule 30(a), W.R.Cr.P.[5]

---

**5.** Rule 30(a), W.R.Cr.P., provides:
"(a) *Motion before submission to jury.*—Motions for directed verdict are abolished and

motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order

The court heard arguments of counsel and denied the motion for judgment of acquittal. Appellant then, as was his right, informed the court that he would not testify nor would he offer witnesses, testimony, or evidence; and he rested his case. In this posture, the case went to the jury and, following deliberation, the jury, on January 18, 1983, returned its verdict of guilty of attempted sexual assault felony murder.

Following receipt of the jury's verdict, appellant again moved for judgment of acquittal or for a new trial. That motion was denied by the court on January 31, 1983.

There is no dispute between the parties nor is any issue raised concerning proof of the crime of attempted sexual assault felony murder (the corpus delicti). Appellant contends that the evidence was insufficient to establish beyond a reasonable doubt that he was the person who committed the crime.

Cleo Fuller was unable to identify her assailant. Thus, there was no direct evidence establishing the identity of her attacker; and the State of Wyoming relied upon circumstantial evidence to establish this fact.

Direct evidence ordinarily consists of witnesses testifying directly of their own knowledge as to the ultimate facts sought to be proved (in this case identification of the assailant). Circumstantial evidence, on the other hand, is proof of facts and circumstances from which the main fact to be proved reasonably follows according to common experience of mankind. 29 Am.Jur.2d, Evidence § 264. In *State v. Goettina,* 61 Wyo. 420, 158 P.2d 865 (1945), we said, "Circumstantial evidence is the proof of collateral facts and circumstances from which the mind arrives at the conclusion that the main fact sought to be established in fact existed."

Circumstantial evidence is admissible to establish the elements of a

crime, the corpus delicti, and the identity of the perpetrator of the crime. Where the crime results in the death of the victim and there is no eyewitness identification of the perpetrator, circumstantial evidence is the only proof available. Thus, the use of independent facts from which an inference of the ultimate fact to be established may rationally be drawn in the light of common experience is proper. *Russell v. State,* Wyo., 583 P.2d 690 (1978).

Where the ultimate fact to be proved is the identification of the assailant, as in this case, that identification may be proven by his height, weight, age, strength, clothing he was wearing at the time, scars, cuts, scratches or markings upon his body, comments made by him, his mannerisms or reactions to events, opportunity to commit the offense, inability to account for his whereabouts at the time of commission of the offense, and any other fact reasonably tending to establish, when taken with all other facts and circumstances, the ultimate fact sought to be proved. As stated in *Johnson v. State,* Wyo., 562 P.2d 1294, 1297 (1977), quoting from another case, it is:

"* * * [a] fabric of known facts, which may be inconsequential alone, but become important when they are tied to other facts which lead to inevitable conclusions as to facts in issue. * * *"

Circumstantial evidence is not necessarily inferior to direct evidence. In some instances it may be stronger and more persuasive than an uncertain eyewitness identification or identification in a questionable lineup. Circumstances, when taken together and considered in their totality together with all reasonable inferences that may be drawn therefrom, may be subject to different interpretations; but, that is for the jury and not this court on appeal. *Russell v. State,* supra. Where reasonable persons could find the ultimate fact established beyond a reasonable doubt, it is for the jury

the entry of judgment of acquittal of one (1) or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or of-

fenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the state is not granted, the defendant may offer evidence without having reserved the right."

to say whether such fact is established or not.

In this case, Cleo Fuller was appellant's landlady. He had done some yard work for her and was acquainted with the location of the house. He was drinking heavily the night of this incident, perhaps involved in drugs. He left Goodman's house between 10:45 and 11:00 p.m. The attempted sexual assault and beating of Mrs. Fuller occurred some time after 10:45 and before 11:20 p.m. the night of July 18, 1982. Appellant could not account for his whereabouts from 10:45 p.m. until 11:20 or 11:30 p.m. At that time, friends of appellant, returning to his home, found that the bathtub contained water as if someone had been bathing, or was preparing to bathe, and then found appellant in a woodbox with the lid closed, naked and in some distress. Appellant had marks and fresh blood on his back and right shoulder that appeared to be scratches from fingernails. Cleo Fuller said she dug hard and scratched her assailant.

Appellant delivered to investigating officers the T-shirt he had been wearing the night of the assault of Cleo Fuller. It contained blood. A towel taken from appellant's home, still damp, was found to contain a hair that matched the hair from Cleo Fuller's head.

From these circumstances, the jury could reasonably infer that appellant left the Goodman home at 10:45 p.m., drunk and upset by the rejection of a young lady a few minutes before. He told officers he did crazy things when he was drunk. He stopped at Mrs. Fuller's house, assaulted her, she dug her fingernails into his back and shoulder, and he was scratched by her. When he was kicked, he left, returning to his home. The door was locked. He broke open the door, entered his home, and drew a bath. Then he heard someone arriving at his house, but not knowing who was coming and not wanting to be seen, he hid in the woodbox.

When taken out of the woodbox, the scratches on his back and shoulder were observed. The T-shirt he wore earlier had blood on it. The towel, still damp, contained a hair that matched Cleo Fuller's hair. He told an officer he could have done it. There was a discussion at his house concerning the assault on Cleo Fuller, and when it was stated that she had offered money and rings to her assailant, he responded, "Yeah." He accused another of raping the "seventy-year-old woman." Upon these circumstances, the jury found that he was the person who had assaulted Cleo Fuller and caused her death.

Was the evidence sufficient to sustain the conviction of attempted sexual assault felony murder? Initially that matter is addressed to the sound discretion of the trial court in ruling upon the motion for judgment of acquittal. On review, we are in the same position as the trial court in considering the propriety of that court's ruling. *Aragon v. State,* Wyo., 627 P.2d 599 (1981).

Our standard of review has been established as,

" * * * In determining whether there exists substantial evidence, either direct, circumstantial, or both, in support of the verdict, we must view the evidence presented in the light most favorable to the prosecution, leaving out of consideration any evidence in conflict therewith, while drawing all reasonable inferences possible therefrom. * * * " *Russell v. State,* supra, 583 P.2d at 700.

Applying these principles and this standard of review to this case, there was substantial evidence from which the jury could find that appellant, beyond a reasonable doubt, was the person guilty of the crime charged. The judgment and sentence of the court, therefore, is affirmed.